**In re Oliver L. NORTH, et al. (BUSH FEE APPLICATION)**

**Division No. 86–6.**

United States Court of Appeals, District of Columbia Circuit.

(Division for the Purpose of Appointing Independent Counsels Ethics in Government Act of 1978, as Amended).

June 9, 1995.

Before: SENTELLE, Presiding,
BUTZNER and FAY, Senior Circuit Judges.

## ORDER

PER CURIAM.

This matter coming to be heard and being heard before the Special Division of the Court, upon the application of former Presi-

dent George H.W. Bush for reimbursement of attorneys' fees pursuant to section 593(f) of the Ethics in Government Act of 1978, as Amended, 28 U.S.C. § 591 *et seq.* (1988 & Supp. V 1993), and it appearing to the Court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the motion is well taken, it is hereby

**ORDERED, ADJUDGED, AND DE-CREED** that the United States reimburse former President George H.W. Bush for attorneys' fees he incurred during the investigation by Independent Counsel Lawrence E. Walsh in the amount of $272,352.51, this 9th day of June, 1995.

Opinion for the Special Court filed PER CURIAM.

PER CURIAM:

Former President and Vice President George Herbert Walker Bush seeks reimbursement under section 593(f) of the Ethics in Government Act of 1978, as Amended, 28 U.S.C. § 591 *et seq.* (1988 & Supp. V 1993) ("the Act") for attorneys' fees incurred by him between December 27, 1992, and November 30, 1993, as a result of the Iran/Contra Investigation conducted by Independent Counsel Lawrence E. Walsh. Under the applicable statute, former President Bush is entitled to reimbursement if he satisfies the provisions of 28 U.S.C. § 593(f)(1) which allow reimbursement to one "who is the subject of an investigation conducted by an independent counsel pursuant to [the Act] ... if no indictment is brought against such individual pursuant to that investigation" for "reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act]." Upon examination of the former President's petition and supporting exhibits, review of relevant precedent, and with the benefit of the comments from the Department of Justice, we conclude that President Bush is entitled to an award of reasonable attorneys' fees incurred. For various reasons, which we will discuss in detail below, we conclude that he has not carried his burden with respect to the full amount for which he seeks reimbursement and therefore our award is only partial.

## I. BACKGROUND

On December 4, 1986, then Attorney General Edwin Meese filed an application with this Division requesting that we appoint an independent counsel "to investigate and if warranted to prosecute alleged violation of criminal laws by Lt. Col. Oliver North, and other United States government officials, or other individuals acting in concert with [them] in connection with the sale of shipments of military arms to Iran and the transfer or diversion of funds realized in connection with such sale or shipment." That investigation concluded with the filing of Independent Counsel Walsh's two volume Report on August 4, 1993, followed by the filing of his compilation of the responses to the Report on December 3, 1993.[1]

On December 24, 1992, as Walsh's undertaking began its seventh year, then President Bush pardoned former Secretary of Defense Caspar Weinberger, former Assistant Secretary of State Elliott Abrams; CIA Officers Duane Clarridge, Alan Fiers and Clair George; and former National Security Advisor Robert McFarlane. Independent Counsel Walsh, publicly declaring himself "gravely concerned" by Bush's decision to pardon those Iran/Contra figures, vowed to continue his investigation to "see where the facts lead." *ABC News Nightline,* December 24, 1992, Transcript No. 3024 at 6. On December 27, 1992, President Bush, believing himself to be a subject of the investigation, contacted and retained former Attorney General Griffin Bell and his law firm, King & Spalding ("K & S") to defend him in the investigation. When the investigation terminated without indictment against Bush having been returned, K & S filed a comment to the Report with exhibits. The comment and its exhibits were published along with the other comments to the Report on December 3, 1993. On March 9, 1994, Bell filed the present petition on behalf of former President Bush. On March 15, 1994, we forwarded a

---

1. For further history of the much storied Iran/Contra Investigation, *see In re North (Shultz Fee Application),* 8 F.3d 847, 849 (D.C.Cir.1993) (per curiam) and cases collected therein.

copy of the application to Attorney General Janet Reno pursuant to 28 U.S.C. § 593(f) and requested a written evaluation of the request for attorneys' fees as provided for in that statute. On October 4, 1994, Bell filed inquiry with the Division as to the status of the fee petition. On October 11, we made inquiry to the Department of Justice as to the status of the Department's evaluation. On February 3, 1995, Attorney General Reno filed her evaluation. On February 16, 1995, Bush filed a response to the Attorney General's evaluation. Upon review of the application and its accompanying exhibits, the pleadings and the authorities offered in support thereof, and the Act, we have reached the conclusions set forth herein.

## II. ANALYSIS

### A. *The Substantive Elements*

■ As we noted above, the Act permits the reimbursement of fees only to "an individual who is the subject of an investigation conducted by an independent counsel...." 28 U.S.C. § 593(f)(1). Thus, there are four elements which an applicant must demonstrate in order to establish his entitlement to a fee award:

(1) he is a "subject" of such an investigation;

(2) the fees were incurred "during" the investigation;

(3) to be reimbursable, the fees must be such as "would not have been incurred but for the requirements of the Act;" and

(4) the fees are "reasonable."

*See In re North (Dutton Fee Application)*, 11 F.3d 1075 (D.C.Cir.1993) (per curiam) (internal brackets omitted). For the reasons set forth below, we conclude that the former President has met the first three, or "substantive" requirements, but has fallen short of establishing the reasonableness of a portion of the fees prayed.

### 1. *Subject Status*

■ As we have noted before, the Act awards fees only to "an individual who is the subject of an investigation conducted by an independent counsel," 28 U.S.C. § 593(f)(1) (emphasis added), but does not define "sub-

ject." *See Dutton*, 11 F.3d at 1077. Because the intent of Congress was that fees were only to be awarded where the applicant had expended funds "reasonably related to a defense to such investigation," *In re Donovan*, 877 F.2d 982, 993 (D.C.Cir.1989) (per curiam), it was plain to us that the applicant had to be more than a mere witness. *See, e.g., In re Olson*, 884 F.2d 1415, 1427 (D.C.Cir.1989) (holding that the Act provides recovery only for those fees "rendered in asserting the *merits* of the subject's defense against the criminal charges being investigated."). On the other hand, the requirement that the successful applicant not have been indicted made it plain that the status of "subject" is something short of defendant. In *Dutton*, 11 F.3d at 1077, we found informative the definition of "subject" from the United States Attorneys' manual, Title 9, Chapter 11, section 9–11.150: "a 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation." In application to the fee award provision of the Act we narrowed that definition slightly, holding that a "subject" under the Act is

an individual ... whose conduct was within the scope of the grand jury investigation, in the sense that the grand jury was examining conduct of his in a way that would lead a reasonably counseled person at the time of incurring the fees to believe that there was a realistic possibility that he would become a defendant.

*Id.* at 1079. Here, it is beyond serious question—and the Department of Justice does not dispute—that the former President meets this definition.

Immediately following the former President's pardon of the six Iran/Contra figures, Independent Counsel Walsh publicly accused him of "misconduct" which he predicted would lead to "appropriate action." *See ABC News Nightline, supra.* More specifically, at the time President Bush acted to retain the law firm for his defense, media accounts reported that Walsh had said that "Bush ... is now 'the subject of our investigation.'" *See, e.g., President to Disclose Everything, White House Disputes Walsh's Charges of Iran Coverup*, THE WASHINGTON POST, Dec. 26, 1992, at A.1. The documentation to the for-

mer President's application supports a conclusion that K & S specifically asked Walsh to declare that President Bush was not a subject of the investigation and that Walsh declined to do so until the end of his investigation.

It is thus abundantly clear that the former President is "one who, at the time of incurring the fees involved in the application, knew that his conduct was within that scope [of the investigation] in such a fashion that the independent counsel might reasonably be expected to point the finger of accusation at him." *Shultz,* 8 F.3d at 850 (internal quotation marks and citations omitted). Accordingly, former President Bush has met his burden of proving that he was a subject of the investigation.

2. *Fees Incurred During the Investigation*

■ Former President Bush has fully carried his burden with respect to the element that to be reimbursable under section 593(f) his fees must be incurred during the investigation. Although a relatively small portion of the professional services were rendered after the filing of Walsh's two volume Report on August 4, 1993, we have repeatedly held that "since the Act provides that subjects of investigations may file 'comments and factual information [for inclusion in] ... an appendix to such final report,'" professional fees incurred in preparation of such comments are reimbursable under the Act. *Donovan,* 877 F.2d at 994 (quoting 28 U.S.C. § 594(h)). *See also In re North (Platt Fee Application),* 31 F.3d 1188, 1190 (D.C.Cir.1994) (per curiam). Although, for reasons more fully set out in Part B, *infra,* we will disallow a portion of the fees incurred in the preparation of response to Walsh's Report, we will not categorically disallow the entire segment of professional fees for the preparation of comments.

3. *Fees Not Incurred "But For" the Requirements of the Act*

■ The most difficult element for a fee applicant to establish under the Act is that the fees "would not have been incurred but for the requirements of [the Act]." *Dutton,*

11 F.3d at 1079. We have had recent occasion to discuss this requirement in the context of the Iran/Contra Investigation. In *Dutton,* we summarized some of the past circumstances in which we had and had not found the requirement met and reiterated our prior conclusion that the 1983 Amendment creating the right to reimbursement was motivated by a congressional "intent 'to correct an unequal *application* of the "criminal law,'" when high public officials were investigated under the Act in circumstances where private citizens would not be investigated.'" *Id.* at 1080 (quoting *In re Nofziger,* 925 F.2d 428, 442 (D.C.Cir.1991) (per curiam)). We concluded that Dutton had met this requirement by showing that the investigation of the fee petitioner was occasioned by the independent counsel's criminalization of the Boland Amendments, which politically appointed attorneys general as the representatives of the Executive have never treated as having criminal consequences. *Id.*

In *Shultz,* we held that a former Secretary of State had met the "but for" requirement in part because of the criminalization of the Boland Amendments circumvention and in part because a "professional prosecutor, as opposed to an independent counsel under the Act, would not normally have been making subjects out of persons theretofore treated as witnesses four and one-half years after the commencement of an investigation...." 8 F.3d at 851. We did recognize, however, that the shift in status from witness to subject might occur under "some circumstances far more extraordinary than any displayed to us" in that case. *Id.* Even granting that the entry of the presidential pardon of the six Iran/Contra figures was an extraordinary circumstance, we do not find the exercise of that traditional presidential prerogative to constitute such circumstances as would be likely to have triggered an investigation of the President in the absence of the Act.

One large segment of the time spent researching and drafting an ultimately unfiled motion challenging Walsh's authority plainly would not have been incurred but for the Act. Since no other prior independent counsel investigation had reached or approached the scope of the Iran/Contra Investigation,

the former President's attorneys were quite justified in pursuing proceedings to test the limits of the independent counsel's authority. Those portions of the attorneys' services, like the services we found to meet the "but for" requirement in *Olson*, "uniquely satisfy the 'but for' requirement. . . ." 884 F.2d at 1421.

Therefore, we hold that the former President, otherwise similarly situated to the petitioner in *Shultz*, has met the "but for" requirement.

## B. *Reasonableness of Fees*

 Having made it past the three shoals of the substantive elements, a part of the former President's petition founders on the rocks of the reasonableness requirement. As we have held several times, the fee petitioner bears the burden of establishing all elements of his entitlement. *See, e.g., Shultz*, 8 F.3d at 850; *Dutton*, 11 F.3d at 1081. As we have also said more than once, items of expense or fees that may not be "unreasonable between a first class law firm and a solvent client, are not [always] supported by indicia of reasonableness sufficient to allow us justly to tax the same against the United States." *Shultz* at 852; *see also Donovan*, 877 F.2d at 996 (without passing on the propriety of professional judgments, counsel is not free to " 'exercise its judgment in a fashion that unnecessarily inflates the [other] party's fee liability. . . .' ") (quoting *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 369 (D.D.C.1983)). In several ways and under several headings, the fee petition fits that categorization. As in *Donovan*, we do not "pass judgment on the propriety" of professional decisions of counsel or the wisdom of their client's decision in its contract, but we are duty bound to recall that Congress required us to exercise our independent judgment on the reasonableness of fees requested before taxing them against the United States. Thus we must make several deductions from the $461,346.51 claimed.

### 1. *Rates*

 The fee petition follows the familiar formula of professional hours expended multiplied by the hourly rate of the billing professional. *See, e.g., Donovan*, 877 F.2d at 991 n. 17. Each element must be reasonable, and, as to the reasonableness of each element, the party seeking reimbursement bears the burden. In the present case, the statement of K & S shows recorded time billed for twelve timekeepers. As to four of those timekeepers, Perri Aileen Lovaas, Lisa A. Lindstrom, Polly J. Price, and Kevin Quirk, the firm has presented no evidence as to their hourly rates or the reasonableness of those rates. K & S's statement to the former President reflects billings for the time of those four professionals in the amount of 146.7 hours, which represents approximately 5.12% of the 2,861.2 hours billed by the firm. As the petitioner has done nothing to carry his burden with respect to the reasonableness of those hours or their rate, we can award nothing from the United States as recompense. Therefore, we have made deduction for those hours. Since we do not know the rate of those timekeepers, we have assumed that they billed at the average billing rate of K & S professional services and therefore we reduce the prayer of $439,201.50 by a factor of 5.12% or $22,487.12.

 As to the reasonableness of the billing rates of the other eight timekeepers, Griffin Bell, James D. Miller, J. Sedwick Sollers, III, James C. Snyder, Allison G. French, Phyllis B. Sumner, Kerrie C. Dent, and Zachary T. Fardon, petitioner has offered us the single affidavit of a distinguished Washington attorney in which he swears only that he is familiar with their rates and "believe[s] these rates to be reasonable and commensurate with other comparable Washington, DC firms." He does not swear to any knowledge of the qualifications of the particular professionals involved, however, or to the rates at which they customarily bill their time for other clients in matters of comparable complexity and importance. Therefore, we cannot conclude that K & S has totally carried President Bush's burden of establishing the reasonableness of the rates. As in other cases in which we have found inadequate support for the reasonableness but sufficient support to find the rates partially reasonable, we will make a percentage adjustment to reflect the failure of petitioner to carry his burden. *Cf. Donovan*, 877 F.2d at 996 (re-

ducing hours of a professional by ⅓ to correct for duplicative services); *Dutton,* 11 F.3d at 1081 (applying a pro rata basis to allocate time between eligible and ineligible items). Given the paucity of evidence offered by petitioner on reasonableness, we will apply a 10% reduction in the final total to reflect the lack of evidence on reasonableness. We will not apply this reduction until our final determination of reasonable hours has been completed as its effect will differ as to different professionals if we apply the reduction across the board before determining which hours are allowable. Therefore, we will proceed to make deductions for disallowable items and categories of items and then return to the 10% overall reasonableness deduction only as to the subtotal reached at that phase of calculation.[2]

### 2. *Duplication*

■ As to specific items and categories of items, we begin with the problem of duplication of effort. We noted in *Donovan,* among other cases, that though it may be reasonable for a solvent client charged with a serious offense to pay the additional costs of having a highly staffed case, 877 F.2d at 996, this does not mean that petitioner has established the reasonableness of billing that sort of duplication (or in this case triplication or more) to the public fisc. *See also In re Meese,* 907 F.2d 1192, 1204 (D.C.Cir.1990) (per curiam); *Olson,* 884 F.2d at 1428–29.

We find the following items of multiple attorney time entries not adequately justified to warrant taxing against the taxpayers:

On December 27, 1992, Sollers and Sumner billed 11.6 and 8.3 hours respectively inclusive of telephone conference calls which apparently overlap. As in prior cases, we note that the timekeeping is by day rather than by task, *see Olson,* 884 F.2d at 1428–29, and therefore we have had to make some fairly rough estimates as to what portion does overlap and what to disallow. Given the high number of telephone conferences, lumped in with other items such as travel

(about which more *infra* ) we will reduce the total for that date 2.5 hours. Given that Sumner's rate is the lower of the two, those will be deducted at Sumner's rate.

On December 28, Sollers and Sumner again have apparently overlapping hours, this time totalling 21.4 and on the same date Fardon and French have .6 and .5 hours respectively all of it attributable to informational meetings with Sollers. We therefore will deduct the hours of Fardon and French and 2.5 of the hours of Summer.

On December 29, Sollers, Sumner, Fardon and French devote among them 31.2 hours to tasks with overlapping descriptions. We are deducting the 6.9 hours attributable to Fardon together with 2.8 of Sumner's hours.

On December 30, Sollers, Dent, Sumner and Fardon billed a total of 48.5 hours, in addition to 3.8 hours for Lindstrom whose time we have already disallowed. In addition to travel for Sumner (*see* "travel," *infra* ) many of the entries are overlapping descriptions of "review transcripts and 'chron' files," "conference," and other items of possible overlapping impact. We have therefore eliminated the time of Fardon, 10.5 hours, at the lower of the rates.

On December 31, Dent, Sollers, French, Miller and Fardon billed 37.5 hours, not including 8.8 hours for Lovaas and Lindstrom which we have already eliminated *supra.* We are unable to determine how much of the remaining time is overlapping, but have deducted one hour each from Dent, Sollers, French, Miller and Fardon in the theory that the overlap of the subject matter of seven professionals working on the same day (including Lovaas and Lindstrom) was inevitable.

On January 1, 1993, in addition to 11.2 billable hours for Sumner and Lindstrom which have or will be dealt with under other headings, Dent and Sollers logged 10.5 hours including overlapping description, for which we have deducted 1.5 hours of Dent's time. On January 2, Miller, Sumner, French, Dent,

**2.** In her evaluation of President Bush's fee application, the Attorney General argues that hourly fees in the $300–400 range are not properly

reimbursable based on the legislative history of the recent amendments to the Act. We have, however, recently rejected this argument in *In re*

Fardon and Sollers logged 49.5 hours (in addition to 6 for Quirk and Lindstrom) with much apparent overlap. We have deducted 10.1 hours of Dent's time, and 7.5 hours of Fardon's time, as being the lower billing of the professionals for that date.

On January 3, Miller, Sumner, Fardon and Sollers billed 39.8 (Quirk billed 12.5). Sumner's and Fardon's entries reflect precisely the same tasks and almost precisely the same time. We will deduct 11.5 hours of Sumner's time as representing the shorter of the two time periods (11.5 as against 11.7).

On January 4, Bell, Miller, Sumner, French, Dent, Fardon and Sollers billed a total of 68.7 hours (in addition to 5 between Quirk and Lindstrom). We will disallow the time entries of Dent, Fardon and Sollers to reflect the apparent and inevitable overlap of services.

On January 5, Miller, Sumner, Snyder, French, Dent, Fardon and Sollers logged 56.7 hours. French's hours do not appear to reflect any duplication. We have therefore deducted the other three lowest rate timekeepers, Sumner, Dent and Fardon.

On January 6, Miller, Sumner, Snyder, French, Dent, Fardon and Sollers billed a total of 57.6 hours. Again, their overlap appears to be extensive and not sufficiently justified to bill to the taxpayers. Again we have deducted the time of Dent, Sumner and Fardon.

On January 7, Sumner, Snyder, French, Dent, Fardon and Sollers logged 53 hours. We have deducted the time of French, Dent and Fardon.

On January 8, Sumner, Snyder, French, Dent, Fardon and Sollers billed 58.6 hours, much of it in conferences with each other. The time of French does not appear to reflect any duplication with other timekeepers, so we have deducted the next three lowest timekeepers, Dent, Sumner and Fardon.[3]

On January 9, Bell, Miller, Snyder, French, Dent and Sollers billed a total of 22.3 hours. The four hours of French and the 1.1 hour of Miller do not appear to include any

probable duplication. We have deducted the time of Dent and Snyder.

On January 10, Sumner, Snyder, French, Fardon and Sollers recorded 25 hours. French's time again looks unduplicated, and we have deducted the time of Fardon and Sumner.

On January 11, Bell, Miller, Snyder, French, Dent, Fardon and Sollers logged 35 hours. Much of it, not including that of French, appears to reflect multiply-staffed tasks, and we have deducted the time of Fardon, Dent and Snyder.

On January 12, Miller, Snyder, French, Dent, Fardon and Sollers recorded 43.7, some of it from meetings with each other. We have deducted the time of Fardon, Dent and Sollers but have not deducted for Snyder, whose time entry appears to be less duplicative than the others.

On January 13, Bell, Snyder, French, Dent, Fardon and Sollers recorded 40.8 hours. French's hours appear unduplicated, and we deduct the time of Fardon, Dent and Snyder.

On January 14, Bell, Sumner, Snyder, French, Dent, Fardon and Sollers all had entries, totalling 58.9 hours. We have deducted the entries attributable to Fardon, Sumner, Dent and Snyder.

On January 15, Bell, Snyder, French, Dent, Fardon and Sollers billed a total of 52.6 hours, including many apparently overlapping entries. We have deducted the time of French, Fardon and Dent.

On January 16, only French, Fardon and Sollers logged time, but the entries appear to be completely overlapping. We have therefore deducted 13.6 hours attributed to French.

On January 17, only Snyder, French and Fardon logged time, but again the entries appear to be completely encompassing of each other, and we have deducted the 15 hours attributable to Fardon.

On January 18, Bell, Snyder, French, Dent, Fardon and Sollers logged 38.7 hours, several of the entries including what appear

---

*North (Armitage Fee Application)*, 50 F.3d 42, 44–46 (D.C.Cir.1995).

**3.** We have deducted only 11 hours of Sumner's 15.4 under the heading of duplication, as the

additional entries for "travel" will be dealt with under a separate heading.

to be multiple attendance at the same conferences, or production of the same documents. We have deducted the hours of French (which appear to completely overlap Fardon), Dent (which appear to completely overlap Snyder), and Bell (which appear to be completely encompassed within Sollers' time).

On January 19, Bell, Snyder, French, Dent, Fardon and Sollers entered 46 hours. We have deducted the time of Bell and Snyder, all of which appears to be completely encompassed within the time of one or another of their colleagues.

On January 21, Snyder, French, Dent, Sollers and Fardon worked 23.9 hours. Though French's time seems to stand alone, we deduct the time of Fardon and Dent as the lowest two remaining timekeepers to eliminate what appears to us to be insufficiently justified multiple staffing.

On January 22, Snyder, French, Dent, Sollers and Fardon billed 21.4 hours. All of Fardon's time appears to be encompassed within that of Snyder and we have deducted it. As well, we have deducted the time of Dent, which appears to overlap that of his fellow billed professionals.

On January 25, Bell, Snyder, French, Dent, Sollers and Fardon billed 44.2 hours. We have deducted the time of Bell, which appears to be totally encompassed within that of Sollers, as well as that of Fardon and Dent, which appear to duplicate other timekeepers on that date.

On January 26, Bell, Snyder, French, Dent, Sollers and Fardon recorded 50.8 hours. Again, Bell's time appears to be totally included within Sollers' and we therefore deduct it. We also deduct the time of French, Fardon and Dent.

On January 27, Snyder, French, Dent, Sollers, Fardon and Miller logged 45.3 hours. We have deducted the entries of Fardon and Dent.

On January 28, Bell, Snyder, French, Dent, Sollers and Fardon all had time entries (as well as Lovaas, already deducted) totalling 39.9 hours. Bell's time appears to be completely encompassed within Sollers' and we have deducted it, as well as the entries of French and Fardon.

On January 29, Snyder, French, Dent, Sollers and Fardon (as well as Price, already deducted) logged time amounting to 37.3 hours. We have deducted the time of French and Fardon.

On February 1, Bell, Snyder, French, Dent and Fardon all logged time. Dent's time appears to be totally encompassed with that of fellow billing professionals, and we will deduct it along with that of Fardon.

On February 2, Bell, Snyder, French, Dent, Sollers, Miller and Fardon all billed time, totalling 35.9 hours. Each of Dent's described tasks appears to be duplicative of some other professional, and we will disallow that time.

On February 3, Snyder, French, Dent (twice), Sollers and Fardon all logged time (as well as Lovaas, already deducted) totalling 37.6 hours. The time of French, Snyder and Dent appears to be largely duplicative and we have deducted French's 10.1 hours as well as 7.2 hours of Dent's time.

On February 4, Snyder, French, Dent (twice), Sollers and Fardon all logged time, totalling 39.2 hours. As French's time appears nonduplicative, we deducted the time of the next two least expensive timekeepers—Fardon and Dent.

On February 5, Snyder, French, Sollers, Dent (twice) and Fardon recorded 31.2 hours, much of it apparently multiply-staffed again except for that of French, and we have deducted the time of Dent and Fardon.

On February 8, Sollers, French, Dent (twice), Fardon, Miller, and Snyder (as well as Lovaas, already excluded) logged a total of 37.4 hours. The time of Miller appears to be completely encompassed within Dent's and we deduct that of Miller. We also deduct the time entries of Fardon on that date to reflect the inevitable duplication inherent in that many professionals billing in that short a time span on the same matter.

On February 9, French, Snyder, Fardon, Sollers and Dent (twice) all billed time totalling 39.7 hours. We deduct the 12.6 hours of Dent's time to protect against duplication.

On February 10, Bell, Dent, French, Snyder, Fardon and Sollers billed 40.7 hours (exclusive of the 3 hours attributed to Lovaas). The time of Bell appears to be completely encompassed within that of Sollers and we will deduct the time of Bell, along with that of Fardon, Dent and Snyder.

On February 11, French, Bell, Dent, Snyder, Fardon and Sollers all had entries totalling 41.6 hours exclusive of an hour attributed to Lovaas. Bell's time appears to be completely encompassed within Sollers' and we will deduct it. We will also deduct the time of Snyder which appears to be largely duplicated within that of his fellow billing professionals.

On February 12, French, Dent, Snyder and Sollers logged a total of 29 hours. We will deduct the time of Dent.

On February 15, French, Dent, Fardon, Snyder and Sollers billed time in the amount of 35 hours (not including Lovaas). The time of Dent appears to be included within that of fellow professionals, as does that of Fardon, and we are deducting their entries.

On February 16, Bell, French, Dent, Fardon, Miller, Snyder and Sollers billed a total of 31.4 hours. Bell's time appears to be completely encompassed in that of others, and we will deduct it. Fardon's time appears to be encompassed within Snyder's and we will deduct Fardon's.

On February 17, Dent, French, Fardon, Snyder and Sollers billed a total of 45.2 hours (not including Lovaas). We will deduct the time of French and Fardon, the lowest rated professional billing for that date.

On February 18, Dent, French, Fardon, Snyder and Sollers (Lovaas already deducted) billed a total of 40.4 hours. As the time of paralegal French does not appear to be duplicative, we have deducted the time of Fardon and Dent, the lowest billing attorneys on that date.

On February 19, French, Bell, Dent, Fardon, Snyder and Sollers billed 44.4 hours. French's time appears possibly duplicative of Snyder's and we are deducting the time of French, as well as that of Fardon, the lowest billing other professional on that date.

On February 22, French, Fardon, Snyder and Sollers (not including Lovaas) billed 28.5 hours. Sollers' time appears to be almost entirely encompassed within that of his colleagues, and we are deducting his along with that of Fardon.

On February 23, French, Dent, Snyder, Fardon and Sollers (not including Lovaas), all billed a total of 26.3 hours. Sollers' time appears to be totally encompassed and we are deducting it along with that of Dent.

On February 24, French, Bell, Dent, Fardon, Snyder and Sollers (excluding Lovaas) billed time totalling 31 hours. We have deducted for the time of Fardon.

On February 25, Bell, French, Miller, Dent, Fardon, Snyder and Sollers (excluding Lovaas) all logged time, totalling 29 hours. The time of Bell appears to be completely encompassed within that of Sollers and Miller and we have deducted Bell's.

Beyond February 25, 1993, perhaps reflecting completion of the first phase of the representation, we do not detect the same necessity to deduct for duplicative effort. While that is not to say we will not have other deductions on a task-related basis, we will not further deduct for duplication per se. We reiterate that we do not intend to tar K. & S or any professionals within that renowned law firm with any brush of over-billing or over-staffing as related to their relationship with this or any other client. We simply conclude that the petitioner has not sufficiently justified the degree of staffing represented by our detailed analysis to bring it within the zone of reasonableness contemplated by Congress in enacting 28 U.S.C. § 593(f).

Set forth below is a summary of our deductions for duplication:

### DEDUCTION SUMMARY CHART

| Billing Professional | Hours Deducted | Rate/Hour | Total |
|---|---|---|---|
| Phyllis Sumner | 53 | $148.00 | 7844.00 |
| Zachary Fardon | 258.2 | $126.00 | 32,533.20 |
| Allison French | 95.1 | $ 73.00 | 6942.30 |
| Kerrie Dent | 231 | $164.00 | 37,884.00 |
| J. Sedwick Sollers, III | 26.2 | $233.00 | 6104.60 |
| James Miller | .4 | $267.00 | 106.80 |
| James Snyder | 60.3 | $170.00 | 10,251.00 |
| Griffin Bell | 13.9 | $375.00 | 5212.50 |
| **Grand Total of Deductions $106,878.40** | | | |

### 3. Task–Related Deductions

In addition to the deductions for inadequately established reasonableness of rates and for multiple staffing not within the contemplation of the "reasonable" fees made reimbursable by Congress, we disallow certain specific items as not being within the award permissible under the Act. "The Act provides only for the reimbursement of those attorneys' fees . . . 'rendered in asserting the merits of the subject's defense against the criminal charges being investigated.'" *In re Meese*, 907 F.2d at 1203 (quoting *Olson*, 884 F.2d at 1427).

■■■ The first such disallowance is a categorical one. As we hinted above, some of the travel time billed by K & S is not reimbursable within the Act. Obviously, this type representation requires some travel, and we do not disallow all travel. However, beginning with an entry by Sumner on December 27, 1992, the firm bills for travel for Atlanta-based lawyers to Washington, DC. While we do not quarrel with this as billable time between a client and his chosen attorney, in the absence of some showing that local counsel could not have rendered the service involved and thereby obviated the necessity of employing an attorney who must necessarily spend billable time travelling from his normal home to the work site, we do not find such travel to be within the reasonableness contemplated by Congress. *See McDowell v. Moore*, 635 F.Supp. 280, 283 (W.D.N.C.1986) (attorneys' fee award will be reduced where no evidence supports determination "that it was necessary or reasonable to employ out-of-town counsel."). *See also Olson*, 884 F.2d at 1428 (holding that the court should exclude from a fee request hours that are "excessive, redundant, or otherwise unnecessary") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983)). Especially is this true where the worksite is in Washington, DC. Here, if anywhere, there is no shortage of lawyers.

Because the travel entries are generally mixed with other tasks in the description offered by the timekeepers' billing statement, it is not always apparent how much time should be attributed to this reduction. However, one entry by Sumner on January 1, 1993, does not mix the task with any others and records for "travel from Atlanta to Washington, DC to continue document review at White House counsel's office" billable time of 4.4 hours. Therefore, we have deducted that amount from the time on that date as well as deducting a similar amount from each time entry mixing travel from Atlanta to Washington with other tasks by Sumner on the following dates: December 27 and 30, 1992, and January 8, 1993.

In addition, there are other tasks not sufficiently supported as reasonably necessary to former President Bush's defense to the investigation. Paralegal Allison French's January 14, 1993, entry for delivery of documents to the White House at 1.2 hours seems to be a task that could have been performed by a non-billing non-professional as part of the overhead of the firm rather than billed by a timekeeper as professional services.

French's entry on January 21, 1993, "Prepare articles for Judge Bell" is not sufficiently explanatory, in light of the dozens of hours she logs on updating notebooks, without some specific explanation of why there had to be a separate task performed here. Therefore, we are deducting one hour of the 4.4 she recorded on that date.

Griffin Bell's entry of February 2, 1993, charging 1.2 hours for "Conference with Ted Hester regarding Approaching Senators" is not documented as having anything to do with the defense against the Independent Counsel's investigation and we will disallow that 1.2 hour entry.

On April 4, 1993, Dent, French and Snyder logged 6.3, 7.3 and 6.5 hours, respectively, for travel to College Station, Texas. There is no explanation of why two attorneys and a paralegal were necessary for the travel, and we have deducted the 6.3 hours of Dent. Likewise we have deducted the same amount for Dent's return trip from College Station to Washington, DC, on April 6, 1993.

All time recorded after August 3, 1993, is within the Act only insofar as it is reasonable time expended in response to the Independent Counsel's Report. We have allowed such time in numerous cases in the past. *See*

*Olson,* 884 F.2d at 1421. Given the size of the investigation and the report in the present case and the pervasive nature of Bush's involvement as Vice President and later President in the events underlying the investigation, quite a large time block is reasonable. However, petitioner has not adequately justified the 198.3 hours claimed. We are reducing that award by 98.3 hours. As this time is billed by various timekeepers, we are applying a composite rate derived by dividing the 2,861.2 hours recorded in the bill into the $439,201.50 billed for professional time, yielding a rate of $153.50 per hour. The following list summarizes the task-related deductions:

### TASK–BASED DEDUCTIONS

| | | | |
|---|---|---|---|
| Sumner | 17.6 | $148.00/hour | $ 2,604.80 |
| French | 2.2 | $ 73.00/hour | $ 160.60 |
| Bell | 1.2 | $375.00/hour | $ 450.00 |
| Dent | 12.6 | $164.00/hour | $ 2,066.40 |
| Report Prep. | 98.3 | $153.50/hour | $15,089.05 |

**TOTAL DEDUCTIONS $20,370.85**

At this point, after making the above deductions, we are allowing reimbursement for billed professional time in the amount of $289,465.13. We reduce that by a factor of 10% to reflect the inadequate foundation for the reasonableness of the rates charged. Thus, we order reimbursement in the amount of $260,518.61 for professional services rendered.

#### 4. *Expenses*

■ In addition to the fees disallowed, some of the expenses incurred and billed to former President Bush are not sufficiently justified to be billable to the taxpayers under the statute. First, regarding a January 15, 1993, bill for $120 for "Support Staff Overtime–ATL," the most commonly offered justification for hourly rates that strike most non-lawyers as exorbitant is that they include not only the attorney's time but the payment of his overhead. As in previous cases, we find that the costs of support staff are properly allocable to overhead, and we disallow this $120 item.

■ Several travel expense items also warrant examination. In the first place, three entries entitled "Hotel and Other Travel Washington" for the periods December 27 through 31, January 6 through 8, and January 1 through 5, totalling, respectively, $703.85, $452.50, and $1,106.95, will be disallowed. As we noted above, there is no justification offered for the use of out-of-town counsel and, as we disallowed the time of travel occasioned by that voluntary choice, so we disallow the expense of travel. Similarly, otherwise unspecified airfare to and from Washington on December 27 through 31, January 1 through 5, January 4, and February 16, with respective amounts of $740, $680, $780, and $370 will be disallowed as being apparently of the same nature. This, in all, totals $4,833.30 in disallowed travel expenses.

Other travel may well have been reasonable. For example, there are several entries for airfare to Houston, College Station, Portland, Kennebunkport and other travel expenses related thereto. These total $6,604.95. As we have previously held, in determining whether or not to allow reimbursement for attorney expenses under the Act, we must ask, "Was this trip necessary?" and "Was a trip this expensive necessary?" *Shultz,* 8 F.3d at 852. In this case, as in *Shultz,* the answer is, we don't know. *Id.* That being the case, we will deduct 75 percent for inadequate documentation of necessity and necessary level of travel and reduce the expenses by $4,953.71.

■ Additionally, for cab fare, the firm billed a total of $449.00. Many of the cab fare entries are not otherwise identified and others are identified as "cab fare home." Obviously, travel to and from home, not even allowable as a tax deduction, is not reimbursable as an expense of legal defense. We are therefore disallowing 90 percent of the cab fare expenses or $404.10.

In sum, out of the $22,145.01 claimed by K & S in expenses, we are deducting $120.00 for overtime, $4,833.30 in Washington travel expenses, $4,953.71 for other travel expenses, and $404.10 in cab fare. Accordingly, we will award $11,833.90 for expenses.

### III. CONCLUSION

Based on the foregoing analysis, we will grant former President Bush's petition in part and award $260,518.61 for professional

services and $11,833.90 for expenses, making a total award of $272,352.51.

*Judgment accordingly.*